### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

MICHAEL D. SIZEMORE,                                    Case No. 1:13-cv-832

                Plaintiff,                          Barrett, J.
                                                        Bowman, M.J.
    v.

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

### REPORT AND RECOMMENDATION

Plaintiff Michael D. Sizemore filed this Social Security appeal in order to challenge the Defendant's finding that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding through counsel, Plaintiff presents three claims of error for this Court's review. As explained below, the ALJ's finding should be AFFIRMED, because it is supported by substantial evidence in the administrative record.

### I.  Summary of Administrative Record

Plaintiff was in his early 50's, or "closely approaching advanced age," on the date that he filed his current application for Supplemental Social Security ("SSI") benefits, and at the time of his last hearing. He has no relevant work history, in part because he was incarcerated for 26 years. Plaintiff was incarcerated from 1978 until 2003 for murdering a fellow U.S. Marine.

In September 2003, shortly before his release from prison, Plaintiff filed his first applications for both Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits, alleging disability for the entire 26 year period of his incarceration on the basis that he was an "ex-convict" and therefore "unemployable." Plaintiff's applications were denied initially and on reconsideration, and he timely

requested an evidentiary hearing before an administrative law judge ("ALJ").  Plaintiff chose not to appear at the hearing and instead requested a decision on the record presented. In his subsequent written decision, ALJ Jordan noted that during a consultative physical examination conducted by Dr. Fritzhand on February 19, 2004, Plaintiff stated, "I never said a physical problem would keep me from working.  I have only said that I would never have anybody tell me what to do."  (Tr. 112).  However, Plaintiff's memory, ability to relate, appearance and orientation were all assessed as "good," and prison records documented no treatment for mental or emotional problems. (Tr. 112-113).

On March 17, 2005, Dr. Rosenthal performed a consultative psychological examination and diagnosed a personality disorder, not otherwise specified, with antisocial and narcissistic traits. (Tr. 113).  Notwithstanding that diagnosis, Dr. Rosenthal found no impairment in Plaintiff's ability to follow one or two step job instructions, only mild impairment in Plaintiff's ability to tolerate work stress and/or to relate to others, and no impairment at all in Plaintiff's ability to sustain attention or concentration.  (Tr. 113).   The ALJ noted that Plaintiff's primary complaint was mental impairment - specifically, his professed inability to take orders from anyone.  However, based upon both the examining consultant's opinions and the opinions of two non-examining consulting psychologists, ALJ Jordan determined Plaintiff's personality disorder was not "severe" and that he was not disabled between 1978 and the date of the October 2004 decision.  (Tr. 110-115).

Plaintiff filed a motion for a preliminary injunction to seek an immediate award of benefits, as well as a *pro se* appeal of the ALJ's adverse decision in this Court.  This Court denied both the preliminary injunction and his appeal, affirming the non-disability

finding.  *See* Civil Case No. 1:05-cv-115; (Tr. 119-124, Tr. 128-143).  Plaintiff appealed both decisions to the Sixth Circuit Court of Appeals, which also affirmed, with the appellate court's last decision dated July 24, 2009.   (Tr. 125-127; Tr. 144-148).

On November 19, 2009, Plaintiff filed a new application for SSI, alleging a new disability onset date of January 1, 2009.  That application also was denied initially and upon reconsideration, and Plaintiff again requested an evidentiary hearing.   On November 10, 2011, Plaintiff appeared before ALJ Samuel A. Rodner, represented by Sarah Vickers, a paralegal at the law firm employed by Plaintiff.[1]  Both Plaintiff and an impartial vocational expert provided testimony.  Plaintiff testified that he has been mostly homeless since his release from prison in 2003, but at the time of the hearing he was living in an apartment paid for by his brother.  (Tr. 52).  He reported receiving a medical card, food stamps, and Ohio disability benefits.  (Tr. 52).  He testified that he obtained his certification as a personal trainer and wrote a novel while in prison.  Since his release, he turned his single novel into two novels, which he continues to seek to publish.  (Tr. 71-72).

On June 12, 2012, ALJ Rodner issued an unfavorable written decision. (Tr. 15-31).   Unlike ALJ Jordan who found only non-severe impairments, ALJ Rodner determined that Plaintiff has the following severe impairments: "mild to moderate coronary artery disease; chronic skin lesions of various kinds with a remote history of skin cancer; anti-social personality disorder; and cannabis use, ongoing, but not material."  (Tr. 18).  However, he held that Plaintiff does not have an impairment or combination of impairments that would meet or medically equal one of the listed

---

[1]In this proceeding, Plaintiff is represented by Henry Acciani, an attorney at the same firm.

impairments in 20 C.F.R. Part 404, Subpart P, Appx. 1. (Tr. 18). Instead, he found that since November 19, 2009,[2] Plaintiff has retained the residual functional capacity ("RFC") to perform a range of unskilled medium work, as follows:

> [H]e can lift/carry fifty pounds occasionally and twenty-five pounds frequently. He has no physical limitations in sitting, standing, or walking. The claimant can have no prolonged exposure to the sun; must avoid even moderate exposure to the sun; and can work indoors. The claimant can have minimal interaction with supervisors and coworkers; and should avoid interaction with the public, but he can still be around the public. He can perform simple, routine, repetitive tasks in order to minimize interaction with supervisors, and should not involve constantly rapid pace.

(Tr. 20).

Given Plaintiff's age, high school education, experience, and RFC, the vocational expert testified, and the ALJ found, that Plaintiff could still perform jobs that exist in significant numbers in the national economy, including such representative jobs as cleaner at either the medium or light exertional levels, or assembler at the same two exertional levels. (Tr. 31). The Appeals Council denied Plaintiff's request for further review; therefore, the ALJ's decision remains as the final decision of the Commissioner.

Plaintiff does not dispute any of the physical limitations found by the ALJ, but argues that he is completely disabled by his anti-social personality disorder. On appeal to this Court, Plaintiff argues that the ALJ erred by: (1) failing to give proper weight to a treating physician and two examining consultants; (2) failing to find that Plaintiff meets Listing 12.08 for Personality Disorders; and (3) finding that Plaintiff was not fully credible. For the reasons stated, I find no error.

---

[2]ALJ Rodner did not consider any period of time prior to Plaintiff's filing date; Plaintiff does not challenge that portion of the decision.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability." *See* 42 U.S.C. §1382c(a).  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies.  *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted).  In conducting this review, the court should consider the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978).  If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).  As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion . . . . The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts.  If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or for disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy.  *See Combs v. Com'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.  A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits.  20 C.F.R. §404.1512(a).

**B.  Specific Errors**

**1.  Medical Opinion Evidence**

Plaintiff first claims that the ALJ erred by improperly evaluating three medical opinions.  Both Plaintiff's treating family practice physician, Dr. Kellie Boyd, as well as an examining consulting psychologist, Dr. Catherine Staskovich, opined that Plaintiff was not employable due to his anti-social personality disorder.  A second consultant, Dr. Steven Fritsch, opined that Plaintiff had "marked" limitations that would "significantly interfere" with his ability to work.

The relevant regulation regarding treating physicians provides: "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s)

6

is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." 20 C.F.R. §404.1527(c)(2); *see also Warner v. Com'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004). The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

> [T]hese sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)(quoting former 20 C.F.R. § 404.1527(d)(2)). Thus, the treating physician rule requires the ALJ to generally give "greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakley v. Com'r of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009). If an ALJ does not give controlling weight to a treating physician's opinion, he or she must articulate the weight given to the opinion, and provide "good reasons" for that decision.

> If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician.

*Blakley v. Com'r of Soc. Sec.*, 581 F.3d at 406 (additional citations omitted). Plaintiff argues that the reasons provided by the ALJ do not satisfy the "good reasons" standard contained in 20 C.F.R. §404.1527(c)(2).

In addition to criticizing the rejection of Dr. Boyd's opinions, Plaintiff asserts that the ALJ erred by discounting the opinions of the two examining psychological

7

consultants. The opinions of examining consultants are generally entitled to greater weight than are the opinions of non-examining consultants. *See* 20 C.F.R.§1527(c)(1); *see also Gayheart v. Com'r*, 710 F.3d 365, 375-376 (6th Cir. 2013). However, on the record presented, the ALJ gave greater weight to the opinions of non-examining consultants than to the opinions of either Dr. Boyd or the examining consultants.

### a. Treating Physician Kelly [Kellie] Boyd, M.D.

Dr. Boyd has been Plaintiff's primary care physician since 2006, seeing him two to four times per year. (Tr. 385, 460). She completed a physical medical source statement on October 8, 2008 for Ohio Job and Family Services in which she indicated Plaintiff had no physical limitations at all, although she also opined that a back problem had limited him in the past and might cause a future limitation. On January 14, 2010, however, Dr. Boyd completed another assessment in connection with Plaintiff's disability claim in which - for the first time - she diagnosed as "new" Plaintiff's antisocial personality disorder, "mostly based on the claimant's subjective statement[s] to her" on the date that she completed the form. (Tr. 27, 385-386, 424). Dr. Boyd completed a third assessment on November 22, 2010 for purposes of Plaintiff's social security claim, in which she opined that Plaintiff was limited to sitting not more than 2 hours per day, required shifting positions at will, with unscheduled breaks throughout the day, and periods of walking around. (Tr. 462). In the third assessment, she opined that Plaintiff was incapable of even low stress jobs due to his psychiatric diagnosis, which "makes it difficult for him to work." (Tr. 461).

During his January 2010 visit, Plaintiff's "chief complaint was that he needed Dr. Boyd to fill out disability papers….In other words, the claimant did not come that day, or any other day, to Dr. Boyd to receive treatment for his alleged mental impairments." (Tr.

27).  Instead, "quoting the claimant, [Dr. Boyd] stated that the claimant had an anti-social personality disorder that 'makes him feel threatened when interacting with others.'" (Tr. 27).  As discussed, the opinion of a treating physician is entitled to "controlling weight" only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record."  Here, the ALJ did not give Dr. Boyd's opinions controlling weight, but instead gave them "significantly reduced weight for being inconsistent with other significant evidence and not based on substantive objective evidence." (Tr. 26).

The ALJ explained the basis for his rejection of Dr. Boyd's functional opinions in great detail. (Tr. 26-29). Despite Dr. Boyd's emphasis on the fact that Plaintiff "had murdered," and reporting that he has "assaulted since, does not want to harm others, but always feels threatened and confrontational when forced to interact with others," Dr. Boyd failed to provide any evidence of the number of times that Plaintiff had assaulted anyone, or any other details of incidents of violence, whether during or after his incarceration.  (Tr. 27).  By contrast, Plaintiff himself testified that the only time he has assaulted anyone since his release from prison in 2003 was when a fight broke out at a party in 2005.  Plaintiff stated he was arrested for assaulting two people, but acted as his own attorney with all charges being dismissed.

The ALJ also pointed out that, notwithstanding Plaintiff's testimony that he was "usually if not constantly, in isolation or 'lock down,'" during his incarceration, there was no corroborating evidence to support that testimony – which was wholly accepted by Dr. Boyd.  Instead, ALJ Jordan's prior opinion explicitly found "no evidence of this [reported prison behavior]" and prison records reflected only a single fight with another inmate in

9

1980, with no documentation of any other acts of violence.[3]  (Tr. 27).  In addition, Plaintiff never "sought, nor received, any mental health treatment while incarcerated." (*Id.*).  Even Dr. Boyd, after the "new" diagnosis of an allegedly disabling personality disorder in January 2010, never prescribed any medications or treatment.

Dr. Boyd's own treatment notes also did not support her opinions.  Her notes reflected that Plaintiff was seen on November 5, 2009 and was "anxious" but neither his anxiety nor any other mental impairment was assessed as a problem.  The next visit in January 2010 was for the sole purpose of having Dr. Boyd complete the mental assessment form for the present social security claim. On March 23, 2011, Dr. Boyd documented situational stressors including Plaintiff's disability claim, his homelessness, and his financial inability to obtain a cardiac stress test.  She noted that Plaintiff was "anxious today," but again did not diagnose that symptom as a mental impairment or problem.  (Tr. 27).  On September 28, 2011, Dr. Boyd noted that Plaintiff's judgment and insight were within normal limits, with no mood disorders and an "appropriate affect."  The undersigned agrees with the ALJ's conclusion that "Dr. Boyd's notes do not even make out a severe mental impairment."  (Tr. 28).  The ALJ noted that the "only objective signs that Dr. Boyd ever reported were that Plaintiff was "irritable and socially avoidant," and that he presented with an "anxious affect, which has been documented only a few times, and positive diaphoresis."  (Tr. 28).  Based on Dr. Boyd's notes and the record as a whole, the ALJ found "no objective supporting evidence for any of the limitations" that she offered.  (Tr. 28).  In fact, Dr. Boyd admitted in the November 22,

---

[3]Plaintiff now disputes the accuracy of those records, but for reasons discussed below, he may not reopen ALJ Jordan's contrary finding.

10

2010 form that her mental evaluation "is based on his physical limitation" and that she had "never evaluated or treated his psychiatric conditions, so this evaluation should be considered very limited."  (Tr. 28; *see also* Tr. 464, emphasis added).

The ALJ similarly found Dr. Boyd's opinions concerning Plaintiff's alleged physical limitations to be entirely inconsistent with the record, including Dr. Boyd's own notes.  (Tr. 28).  Plaintiff does not challenge the ALJ's rejection of Dr. Boyd's opinions concerning his physical limitations.

Having reviewed the record as a whole including but not limited to Dr. Boyd's treatment notes and assessment forms, the undersigned finds no error in the ALJ's rejection of her opinions that Plaintiff has been disabled since 2009 due to extreme mental limitations resulting from his personality disorder. The Commissioner's prior decision that Plaintiff was not disabled due to psychological limitations was previously affirmed by this Court and by the Sixth Circuit.  Dr. Boyd clearly based her opinions on long-ago events and Plaintiff's subjective reports with admittedly no evaluation or treatment of his psychiatric condition.  The prior non-disability decision is *res judicata*; it is worth pointing out that the 1978 murder conviction and 2005 arrest for assault both long pre-dated Plaintiff's presently alleged disability onset date in 2009. The ALJ provided "good reasons" for giving "significantly reduced weight" to Dr. Boyd's opinions, which reasons are supported by substantial evidence in the record as a whole.

### b. Examining Consultants Catherine Staskovich, M.D. and Fritsch, M.D.

Dr. Staskovich first examined Plaintiff on May 30, 2007 in connection with his apparently successful application for benefits through the Butler County, Ohio Department of Jobs and Family Services.  (Tr. 466-467).  On that date, which falls prior

11

to Plaintiff's currently alleged social security disability onset date,[4] Dr. Staskovich opined that Plaintiff was completely "unemployable" due to his antisocial personality disorder. (Tr. 467). She completed a second evaluation on May 17, 2009, in connection with Plaintiff's application for continued state assistance. The 2007 and 2009 assessments contain only minor variances. In 2009, she reiterated that Plaintiff's antisocial personality disorder makes him "unemployable." (Tr. 378). The 2009 form reflects her opinions that Plaintiff was "markedly limited" (no definition provided) in his abilities to: (1) work in proximity to others without being unduly distracted; (2) complete a normal workday or workweek without interruption from psychological symptoms; (3) perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) get along with coworkers or peers; (6) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; (7) respond appropriately to changes in the work setting; or (8) set realistic goals or make plans independently of others. (Tr. 377). She indicated that Plaintiff was "extremely limited" (again, term undefined) in his ability to accept instructions and respond appropriately to criticism from supervisors. (*Id.*). She further opined that Plaintiff's avoidance of interpersonal contact helps reduce his ongoing risk of violent behaviors (Tr. 378), and concluded that Plaintiff's antisocial personality disorder makes him "unemployable." (*Id.*).

A month later on February 25, 2010, Plaintiff was examined by a second consultative examiner, Stephen Fritsch, Psy.D. Dr. Fritsch offered opinions in a

---

[4]In May 2007, Plaintiff's unsuccessful judicial appeal of the denial of his first social security application was still pending.

narrative report, but did not complete a mental residual functional capacity ("MRFC") form. During his exam with Dr. Fritsch, Plaintiff reported regular marijuana use, and that he had never been involved in mental health treatment.  However, he described a long history of problems with emotional and behavioral control and made it clear that he can be reactive, particularly if he feels provoked or disrespected.  (Tr. 439).  Dr. Fritsch opined that Plaintiff had "clear anti-social personality characteristics," and found "extreme" impairments in Plaintiff's ability to relate to others including coworkers or supervisors and in his ability to maintain stable relationships in the workplace.  Dr. Fritsch opined that Plaintiff's antisocial perspective is chronic, pervasive, and would have a "significant negative impact" on work relationships.  He found marked impairment in Plaintiff's ability to withstand stress and pressures associated with work activity.  (Tr. 441).  On the other hand, he assessed Plaintiff with a GAF score of 52, a score that generally indicates only "moderate" symptoms and is not work-preclusive.

On April 6, 2010, a non-examining psychological consultant, Tonnie Hoyle, Psy.D., evaluated the entire record and disagreed with Drs. Staskovich and Fritsch.  Dr. Hoyle completed a MRFC form and explained the basis for her opinions:

> The clmt's ADL's [activities of daily living], presentation, and Dx's are currently same as at time of [prior] ALJ.  He still participates in no Psych tx/rx.  He continues to smoke marij daily.
>
> In current filing, clmt was given an MRFC by Job and Family Services that reflected Marked and Extreme limitations.  Current Psych CE [Dr. Fritsch] also concluded Marked and Extreme.  However, both were basing much of their conclusions on clmt's prior conviction of murder while he was in Marines.  This was explored and considered in the [prior] ALJ decision.  Additionally, it should be noted that the clmt has not had any further legal involvement since his release in 2003.  The two current examiner's gave conclusions on essentially the same functional information and presentation [sic] as was considered in the [prior decision of the] ALJ.  Therefore, the MER and conclusions cannot be considered new or material.

13

(Tr. 456).

On October 28, 2010, a second psychological consultant, Kristen Haskins, Psy.D., affirmed Dr. Hoyle's MRFC opinions for similar reasons:

> Clmt alleges disability due to mental health problems.  He was initially found to have impairments that were not severe.  Clmt presented for a CE [before Dr. Fritsch] on 2/26/10.  His ALJ decision dated 10/28/04 was adopted under AR98-4.  Clmt does not allege any worsening of his psychological conditions.  After careful review of all information in file we are affirming the PRTF dated 4/6/10.
>
> However the prior examination should have indicated…C on PRTF Personality d/o.

(Tr. 458).

ALJ Rodner determined that sufficient "new and material evidence" existed that he was not required to wholly adopt ALJ Jordan's prior RFC findings. (Tr. 24).  He disagreed with Drs. Hoyle and Haskins to the extent that he found that Plaintiff's antisocial personality disorder did constitute a "severe" impairment, and further, that Plaintiff has "moderate limitations in social functioning, as he reports avoiding interacting with others and having trouble dealing with authority." (Tr. 24).  At the same time, ALJ Rodner gave greater weight overall to the opinions of the non-examining consultants than to those of Drs. Staskovich and Fritsch.

As with his rejection of Dr. Boyd's opinions, the ALJ described the context of the two examining consulting reports and his basis for discounting their opinions in significant detail:

> First, Dr. Staskovich based her opinion, on each occasion, solely on the claimant's subjective report.  She was unaware of Administrative Law Judge Jordan's [prior] decision, of the claimant's prison record; and of Dr. Rosenthal's consultative examination in 2005.  Her opinion that the claimant is unemployable is a finding reserved for the Commissioner….

14

Moreover, both Dr. Staskovich and Dr. Fritsch seem to believe that the claimant is automatically mentally disabled because he committed a pre-mediated [sic] murder. Dr. Staskovich also provided, twice, a mental functional capacity form that does not define the terms of the limitations… Further, Dr. Staskovich does not, and could not, provide any examples of significant violent behavior since the murder was committed. Additionally, neither points out that the claimant has never received either inpatient or outpatient mental treatment, neither in or out of prison. Dr. Fritsch, on February 26, 2010, reported…in his mental status exam that the claimant "reported all information in a relatively calm and straight forward fashion….The claimant was cooperative and responded appropriately." This was also the undersigned's impression of the claimant's behavior during the November 10, 2011 hearing. At the end of the hearing, the claimant made a statement to the effect that while he had acted and testified appropriately, he had been just barely able to control the anger, which he felt. However, this anger, was never apparent.

Returning to Dr. Fritsch, despite the claimant's appropriate and calm behavior during the evaluations and despite not having any significant evidence of violent behavior since the murder, Dr. Fritsch decided that the claimant was not embellishing or exaggerating his past history of aggressive behavior and violence. …It is unclear whether or not Dr. Fritsch was referring to only the murder or to other violent and/or aggressive behavior since the murder. However, as [ALJ] Jordan pointed out, there is no evidence of the claimant having engaged in violent behavior while incarcerated in different places from 1978 to 2003. Additionally, there was one altercation documented in 1980…. Further, the claimant testified on November 10, 2011, that since his release in 2003 there has been only one episode of violence and that occurred during a party in 2005 when he said he was assaulted. He said he spent the weekend in the Justice Center, but the charges were dismissed since there was no violence at all.

Also inconsistent with Dr. Fritsch's opinion that the claimant has an "extreme impairment" relating to others in a work environment, the claimant testified that he likes to help people who cannot help themselves and he does odd jobs for these people especially mowing the grass.

(Tr. 25).

The ALJ pointed out even more inconsistencies between Plaintiff's testimony and Dr. Fritsch's report. For example, Plaintiff testified that he lived in a church from 2010 to 2011 and performed janitorial type duties in exchange for living there. He further testified that prior to living in the church, he had cleaned the same church for the same

15

pastor since 2005, and that the pastor was a friend of his family's whom he had known since 2003. However, Plaintiff did not mention any of this long-time work or his relationship with the pastor to Dr. Fritsch. (Tr. 25-26).

The ALJ questioned Dr. Fritsch's acceptance of Plaintiff's report that he frequently had been in isolation in prison due to aggressive behavior, considering Plaintiff's prison records reflected "no evidence of this whatsoever." (Tr. 26). In fact, in contrast to Dr. Fritsch's report, Plaintiff testified on November 11, 2011 that he could "do real well" when working by himself. Dr. Fritsch also reported that the claimant stated I have hurt a lot of men in my life," but "without asking for specifics," which the ALJ noted were completely absent from either Plaintiff's self-report or anywhere else in the record. (Tr. 26). The ALJ therefore reasonably concluded that "Dr. Fritsch is not deserving of much weight for failing to inquire about these specifics." (Tr. 26).

For much the same reasons that the ALJ's rejection of Dr. Boyd's extreme limitations was well-supported by substantial evidence in the record, so too is the ALJ's rejection of the opinions of the two examining consulting psychologists. Like Dr. Boyd, their opinions appear to be based largely on the Plaintiff's 1978 murder conviction and self-report of behaviors that, even by self-report, were isolated and occurred long before the alleged onset of disability in 2009.

### 2. Listing 12.08

Plaintiff argues that the ALJ erred at Step 3 of the sequential analysis by failing to find that he met or equaled Listing 12.08 based upon his 2009 diagnosis of anti-social personality disorder. Plaintiff bears the burden of proof at steps one through four of the sequential analysis, including at step three to demonstrate that he meets or equals a listed impairment, entitling him to a presumption of disability. *See Her v. Com'r of Soc.*

*Sec.*, 203 F.3d 388, 391 (6th Cir. 1999); *Buress v. Sec'y of Health and Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987). In order to determine whether a claimant is disabled under Listing 12.08,

> two separate types of criteria must be met. First, paragraph A … contains a description of certain clinical findings which must be present..... Second, paragraph B of each section contains a list of functional limitations which must also be satisfied.... "The purpose of including the criteria in paragraph B ... of the listings for mental disorders is to describe those functional limitations associated with mental disorders which are incompatible with the ability to work." 20 C.F.R. Pt. 404, Subpart P, App. 1, § 12.00(A).

*Buress.*, 835 F.2d at 141.

To carry his burden of proving that he met or equaled Listing 12.08, then, Plaintiff was required to establish "personality traits [that] are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress" including "features…typical of the individual's long-term functioning and…not limited to discrete episodes of illness." He was required to show at least one listed "deeply ingrained, maladaptive patterns of behavior" under Paragraph A, as well as at least two areas of "marked" restrictions under the specified B criteria.[5] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.08.

Neither in his current appeal nor before the ALJ does Plaintiff identify which of the Paragraph A criteria he claims to satisfy.[6] However, even if he had demonstrated

---

[5]Plaintiff has never claimed to have experienced any episodes of decompensation relevant to the B criteria.

[6]Plaintiff protests that the ALJ focused too much on violent behavior, which is "neither a requirement for this listing nor synonymous with a diagnosis of anti-social personality disorder." No medical source has ever opined that Plaintiff meets or equals Listing 12.08. However, it is fair to interpret the consultants' disability opinions as relevant to the "A" criterion of "[p]athological…aggressivity." Plaintiff himself testified that he avoided people and could not work due to potentially violent or aggressive behavior toward others, making Plaintiff's past violent behavior extremely relevant. Plaintiff does not claim to meet other "A" criteria such as "autistic thinking" or "[[]athologically inappropriate suspiciousness or hostility," or "[o]ddities of thought, perception, speech and behavior." Indeed, Plaintiff's medical records as a whole

the requisite Paragraph A criteria, the ALJ concluded that he did not carry his burden of proof regarding the B criteria.  Focusing on those criteria, Plaintiff was required to show he had "marked" restrictions in two of these three areas: (1) activities of daily living; (2) maintaining social functioning; and/or in (3) concentration, persistence or pace.  In contrast to the "marked" restrictions that Plaintiff was required to prove, ALJ Rodner found Plaintiff had only "mild" restrictions in the first and third categories, and only "moderate" difficulties in social functioning.  (Tr. 19).

Plaintiff argues that the ALJ's "B criteria" findings were unsupported, but his evidence in support of "marked" restrictions in two areas is limited to the previously discounted consulting reports.  With one limited exception, however, even Dr. Staskovich concluded that Plaintiff was "not significantly limited" in nearly all areas of concentration, persistence or pace.  Dr. Fritsch also found "no impairment" in either concentration, persistence or pace, or in activities of daily living.  (Tr. 440-441).  In fact, the only "marked" or "extreme" impairments found by Dr. Fritsch arguably pertain to the same category:  "maintaining social functioning."  Showing "marked" impairment in only one of the B criteria categories is insufficient to prove Listing level severity.

Dr. Fritsch did not complete a MRFC form concerning specific functional impairments.  Nevertheless, aside from his opinions on the B criteria, he opined that Plaintiff's "extreme" and "marked" impairments in his ability to relate to others, including coworkers and supervisors, and in his ability to withstand the stress and pressures associated with work activity, would "negatively impact" his ability to work.  (Tr. 441).

---

including the examination by Dr. Frisch reveal normal mood, articulate and intelligible speech, controlled and stable affect and a calm demeanor.  (*See. e.g.*, Tr. 439). The only other "A" criterion that satisfies the listing is "intense and unstable interpersonal relationships and impulsive and damaging behavior." Again, however, the only evidence relevant to that criterion would have been Plaintiff's past violent behavior.

For the same reasons that the undersigned finds no error in the ALJ's decision to give greater weight overall to the opinions of the non-examining psychologists, I conclude that the ALJ's determination that Plaintiff did not show "marked" restrictions in at least two areas of the B criteria is supported by substantial evidence in the record as a whole.  *Accord Davitto v. Com'r of Soc. Sec.*, 11-CV-15080, 2013 WL 1303774 (E.D. Mich. Jan. 31, 2013) *R&R adopted,* 11-15080, 2013 WL 1296275 (E.D. Mich. Mar. 28, 2013)(affirming ALJ's finding of only "moderate" difficulties in social functioning where Plaintiff, who had severe limitations with getting along with others and accepting criticism, still was able to have a girlfriend for a time and had friends that he often stayed with); *Courtney v. Astrue*, 3:10-CV-342, 2011 WL 3511008 (E.D. Tenn. Aug. 10, 2011)(Plaintiff did not prove error in failure to find he met or equaled Listing 12.08); *Sanders v. Colvin*, 2014 WL 2802977 (N.D. Ohio June 19, 2014)(affirming denial of benefits even though plaintiff had received mental health treatment for schizophrenia and antisocial personality disorder during 23 year incarceration for violent crime).

### 3. Credibility

The ALJ found Plaintiff to be "partially, but not fully credible."  (Tr. 29).  An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility."  *Walters v. Com'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).  Further, a credibility determination cannot be disturbed "absent a compelling reason."  *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001).  Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the

medical records, his testimony, and other evidence.  *Warner v. Com'r of Soc. Sec.*, 375 F.3d at 387, 392 (6th Cir. 2004).

> Here, the ALJ explained the basis for his adverse credibility finding as follows:

> It is believable that the claimant avoids people, but not to the point where he is agoraphobic or otherwise unable to be near people at all.  The claimant is able to drive and able to drive alone.  He goes to the store once per week alone, but tries to avoid people by going after midnight or just going for ten or fewer items during the day so he can get out fast.  The claimant says that he uses the check out machine rather than going to a cashier.  The claimant attends church twice a month, although he testified that he goes to a different church each time in order to avoid getting to know people.  Despite his alleged inability to accept authority figures, especially men, the claimant was able to work for a [male] pastor and live in the pastor's church from August 27, 2010 to April 2011.  Most importantly, the claimant has exaggerated his alleged tendency to be easily provoked into violence for the slightest reason.  He did murder a fellow Marine [in the 70's], but since then there has been no substantial evidence of the claimant having been violent, except in very rare occasions, from 1978 to 2003, and since his release in 2003.  Although the claimant was arrested in 2005 after having assault[ed] two men at a party, the charges were dropped after the claimant spent a weekend at the Justice Center.  The claimant also has an acquaintance who picks up the claimant's mail for him.  The claimant sees his brother regularly and has received financial support from his brother since 2003.

> Additionally, despite his allegations of being severely anti-social, the claimant has never sought mental health treatment by a mental health specialist, either while incarcerated or after his release.  Further, the claimant has never taken any psychoactive medications, despite having medical insurance for a good period of time.  The claimant only alleged a severe anti-social personality disorder to Dr. Boyd when he needed the doctor to fill out disability papers for him.  But Dr. Boyd never prescribed any psychoactive medications or referred the claimant to any mental health specialists.  Rather, most of the time, Dr. Boyd did not even assess any mental impairment or problems.  Moreover, there was not any third party corroboration of his allegations.

(Tr. 29).  The ALJ also pointed out that Plaintiff regularly purchases marijuana from a dealer, and occasionally visits people he views as friends, including the father of a former girlfriend.  He also testified that he likes to help people who cannot help

themselves, and performs odd jobs for those people such as mowing their grass.  (Tr. 25).

Plaintiff argues that both ALJ Jordan and ALJ Rodner were wrong in finding no evidence to corroborate his testimony that he was frequently in isolation while in prison. After ALJ Rodner issued his more recent decision, Plaintiff tendered prison incident reports "for numerous assaults against other inmates" with the brief that he filed with the Appeals Council. (Doc. 9 at 13, citing Tr. 37-44).[7]  However, the Appeals Council denied review, therefore declining to find that the records were "new and material" evidence.

Evidence that was not presented to the ALJ may not be reviewed by this Court for purposes of determining whether substantial evidence exists to uphold the administrative decision. *See Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Because the Appeals Council declined to find the tendered prison records to be sufficiently "new and material" evidence that would provide grounds for further review, this Court is precluded from considering the same records in its own determination of whether substantial evidence exists to uphold the ALJ's non-disability finding.

The only basis under which this Court may consider such evidence is to determine whether remand would otherwise be appropriate under sentence six of 42 U.S.C. §405(g).  Plaintiff has not requested remand under sentence six, but only remand under sentence four.  To that extent, the undersigned also is disinclined to consider the old prison records.  Alternatively, to the extent that Plaintiff may seek a sentence six remand for the first time in his objections to this R&R, a plaintiff must show

---

[7]The latest date of the limited records tendered is March 1993, more than a decade prior to Plaintiff's release.  The last incident of assault reflected in the records appears to have occurred in 1988.

21

both that he possesses evidence that is "new and material" and establish "good cause" to excuse his failure to present that same evidence during the pendency of the administrative proceeding.  *See Oliver v. Sec'y of Health and Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986).  As previously stated, ALJ Jordan's decision was affirmed both by this Court and by the Sixth Circuit Court of Appeals, and the issue of whether Plaintiff was disabled prior to 2009 is no longer before this Court.  To the extent that the old prison records are relevant to the non-disability finding currently on appeal, Plaintiff offers no basis for finding that the evidence is either "new" (since it existed long before the hearing before ALJ Rodner), and no justification that would show "good cause" for his failure to timely submit that evidence.

In short, the undersigned finds substantial evidence in the record to support the ALJ's well-reasoned adverse credibility finding.

### III.  Conclusion and Recommendation

For the reasons discussed above, **IT IS RECOMMENDED THAT** Defendant's decision be **AFFIRMED** and that this case should be **CLOSED**.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

MICHAEL D. SIZEMORE,                                     Case No. 1:13-cv-832

               Plaintiff,                               Barrett, J.
                                                        Bowman, M.J.
     v.

COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

**NOTICE**

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).